**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTER DISTRICT OF VIRGINIA**
(Alexandria Division)

| | | |
|---|---|---|
| HENRY ROUTON,<br><br>Plaintiff,<br><br>v.<br><br>ALVIN HARRIS,<br>STEVE HERRICK,<br>MARK AMONETTE,<br>JOSEPH WALTERS,[1] and<br>JEFFREY DILLMAN,<br><br>Defendants. | ) | **CIVIL ACTION**<br>**No. 23-cv-00224-LMB-LRV**<br>**AMENDED COMPLAINT** |

---

## PRELIMINARY STATEMENT

1. This is a civil rights action under 42 U.S.C. § 1983 alleging, *inter alia*, violations of the Eighth Amendment through deliberate indifference to a serious medical condition. While incarcerated by Virginia Department of Corrections ("VDOC"), plaintiff sought treatment of his Hepatitis C virus ("HCV"). But defendants unreasonably delayed treating plaintiff's HCV, denying him access to Direct Acting Anti-Viral Drugs ("DAADs"). Defendants did so under the perverse

[1] Walters is named in the Initial Complaint but was erroneously entered in CM/ECF as "Waiters."

reasoning that his disease hadn't progressed far enough, as the VDOC Guidelines as they existed at the time excluded treating certain inmates until their disease had progressed sufficiently to cause substantial damage. Such guidelines were constitutionally infirm. Plaintiff thus seeks compensatory and punitive damages as well as attorney's fees and costs.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the constitutional claims in this action pursuant to 28 U.S.C. §§1331 and 1343, and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

3. Venue is proper in this District under 28 U.S.C. § 1391(b), as a substantial part of the acts and omissions giving rise to the unconstitutional practices alleged herein arose in the Eastern District of Virginia.

## PARTIES

4. Plaintiff Henry Routon (hereinafter "Mr. Routon" or "plaintiff") is an inmate currently housed at River North Correctional Center in Independence, Virginia. From 2019 to October 2020**,** Mr. Routon was incarcerated by the Virginia Department of Corrections ("VDOC") and housed at Deerfield Correctional Center ("DCC") in Capron, Virginia.

5. Defendant Alvin Harris, M.D., is a physician licensed in the Commonwealth of Virginia. At all relevant times, Dr. Harris was an agent or employee of defendant Armor and was Mr. Routon's treating physician at DCC. At all relevant times, Dr. Harris acted within the scope of his employment or agency under color of state law and reported to defendant Dr. Amonette. He is sued in his individual capacity.

6. Defendant Steve Herrick, Ph.D. is the Director of the Office of Health Services for VDOC. As such, he is responsible for providing and managing all the medical, dental, pharmacy and mental health care needs of inmates housed throughout the Commonwealth of Virginia. The Director position supervises all clinical department heads and the local health authorities at the facilities. As Director, Dr. Herrick approves all Interim and Final Guidelines and Operating Procedures regarding Hepatitis C treatment for inmates confined in VDOC, including the guidelines and procedures in place at the time Mr. Routon sought treatment in 2019. He is sued in his individual and official capacity.

7. Defendant Dr. Mark Amonette, M.D. is the Chief Physician for the Virginia Department of Corrections. In this capacity, Dr. Amonette is directly responsible for the medical care and health of prisoners committed to the custody of VDOC. Dr. Amonette developed guidelines and operating procedures for Hepatitis C treatment of inmates confined in VDOC. Upon information and belief, at the time

Mr. Routon sought treatment, Dr. Amonette was the sole decision-maker in determining which inmates would be referred for Hepatitis C treatment. Dr. Amonette reports to defendants Dr. Herrick and Walters. He is sued in his individual and official capacity.

8. Defendant Joseph Walters is the Deputy Director of Administration for the Virginia Department of Corrections, a position he began serving in 2018. In this capacity, Walters approves and is the final signatory and approving authority for Interim and Final Guidelines and Operating Procedures regarding Hepatitis C treatment for inmates confined in VDOC, including the guidelines and procedures in place at the time Mr. Routon sought treatment in 2019. Defendants Dr. Amonette and Dr. Herrick report to defendant Walters. He is sued in his individual and official capacity.

9. Defendant Tammy Williams was, at all relevant times, the Warden of DCC. In her capacity, Williams was directly responsible for the care and custody of prisoners committed to the custody of the VDOC who were housed at DCC, and she was also responsible for assuring that inmates at DCC were provided with appropriate medical care. She is sued in her individual capacity.

10. Jeffrey Dillman was, at all relevant times, the Chief of Health Services Operations for VDOC. He is sued in his individual capacity.

## STATEMENT OF FACTS

### I. Hepatitis C and its Treatment with Direct Acting Anti-Viral Drugs ("DAADs")

11. Hepatitis C is an inflammation of the liver caused by the Hepatitis C virus. The virus can cause both acute and chronic hepatitis, ranging in severity from a mild illness to a serious, lifelong illness, including liver cirrhosis and cancer.

12. Indeed, many of those afflicted with chronic HCV will experience liver damage, including scarring of the liver tissue, which is known as progressive fibrosis. And about twenty percent of those with chronic HCV will develop cirrhosis of the liver, that is, long-term liver damage. Cirrhosis can lead to liver failure, and those with cirrhosis also face a significant risk of developing liver cancer. Liver failure and liver cancer frequently develop in HCV-infected individuals up to twenty or thirty years after initial infection. Untreated HCV places patients at an increased risk for serious health issues such as cancer, fibrosis, cirrhosis, and decompensated liver disease.

13. Initial HCV therapies first became available around 1998 and produced inconsistent results and severe side effects.

14. In 2014, the Food and Drug Administration approved the use of Direct Acting Anti-Viral drugs ("DAADs") for the treatment for HCV.

15. The gold standard for Hepatitis C treatment comes from The American Association for the Study of Liver Disease ("AASLD"), who issues its own guidelines that are updated periodically. The AASLD Guidance provides that DAADs cure Hepatitis C infection in ninety-nine percent of cases.

16. The AASLD recommends treatment with DAADs for all patients with chronic HCV infection, except those with short life expectancies. The May 24, 2018 version of the AASLD Guidelines provides: (1) for jails, "[c]hronically infected individuals whose jail sentence is sufficiently long to complete a recommended course of antiviral therapy should receive treatment for chronic HCV infection according to AASLD/IDSA guidance while incarcerated;" and (2) for prisons, "[c]hronically infected individuals should receive antiviral therapy according to AASLD guidance while incarcerated." The AASLD Guidelines also state that "treating chronic HCV in incarcerated persons is cost-effective."

17. Notably, this standard of universal treatment is recommended for everyone with Hepatitis C regardless of the severity of their liver disease.

18. Patients who are cured of their Hepatitis C infection experience multiple

benefits, including a decrease in liver inflammation, improvement in fibrosis, and resolution of cirrhosis in up to fifty percent of patients; diminished rates of portal hypertension, splenomegaly, and other clinical manifestations of advanced liver disease; a seventy percent reduction in the risk of liver cancer; and a ninety percent reduction in the risk of liver-related mortality and requirement for liver transplantation. In addition, cure of Hepatitis C infection also reduces symptoms and mortality from multiple non-liver associated manifestations of viral infection, including joint pain, rates of lymphoma, fatigue, diabetes, cryoglobulinemic vasculitis, and other non-liver cancers.

## II. VDOC HCV Treatment Guidelines

19. In 2015, defendant Dr. Amonette developed an Interim Guideline for Chronic Hepatitis C Infection Management (the "VDOC Guidelines").

20. The VDOC Guidelines were promulgated by defendant Dr. Amonette to each prison's "health authority" (the health policy liaison at each institution responsible for ensuring compliance), and from there to staff, including physicians.

21. Dr. Amonette and VDOC concomitantly arranged a relationship with Virginia Commonwealth University ("VCU") medical personnel, whereby VCU specialists would treat Hepatitis C inmates VDOC referred to them at the VCU Hepatology Clinic.

22. Under the VDOC Guidelines, the decision to refer an inmate for treatment at the VCU Hepatology Clinic was to be based on HCV disease severity, presence of co-morbid conditions, and having sufficient time remaining in VDOC custody to complete the evaluation, treatment, and follow-up.

23. The VDOC Guidelines contained medical testing benchmarks used to determine whether an inmate (1) was referred to VCU for Hepatitis C treatment, (2) subjected to additional testing, or (3) simply monitored once or twice a year without referral to VCU for treatment.[2]

24. The VDOC Guidelines also contained "exclusion" criteria (i.e., circumstances that would or could bar a prisoner from receiving treatment), such as drug or alcohol use, unauthorized tattoos, or having a pending release date within nine months.

25. The VDOC Guidelines required all HCV treatment referrals to be approved by defendant Dr. Amonette before treatment could begin. Specifically, if an institutional physician believed that an inmate should be considered for referral, the physician would forward their medical information, including the results of recent laboratory testing, to defendant Dr. Amonette. Using the above-listed

[2] More specifically, inmates were eligible for referral based on their AST to Platelet Ratio Index ("APRI") and/or Fibrosis-4 scores ("Fib-4"). An inmate with an APRI score greater than 1.5 and a Fib-4 score greater than 3.25 was eligible for immediate referral, while additional testing was required for an inmate with an APRI score between 0.5 and 1.5 and a Fib-4 score between 1.45 and 3.25. (describing "Inclusion Criteria for consideration of treatment").

criteria, defendant Dr. Amonette would determine whether the numerical values in their laboratory results indicated that the inmate should be referred for evaluation.

26. Defendant Dr. Amonette revised the VDOC Guidelines several times between 2015 and the time when defendants denied Mr. Routon access to DAADs.

27. Defendants Dr. Amonette, Dr. Herrick, and Walters were responsible for developing and approving the April 2019 VDOC Guidelines and Infectious Diseases Operating Procedures, which were those in place when Mr. Routon first sought treatment for his HCV.

28. The April 2019 VDOC Guidelines continued to prioritize treatment based on disease severity, by continuing to divide inmates into three priority levels. Inmates in priority levels 1 and 2, which included inmates who were determined to have liver scarring or fibrosis, as well as those inmates with medical conditions that could exacerbate liver disease, could receive treatment for HCV, while priority level 3 inmates, such as Mr. Routon, would merely receive ongoing chronic care monitoring and routine testing to watch for signs of disease progression. The 2019 VDOC Guidelines did contain at least one change from prior versions—an offender must have at least seven months remaining on his sentence to receive the treatment, a reduction from the nine-month period in prior guidelines.

29. Thus, despite AASLD recommendations that all patients with chronic HCV infection receive treatment, and its guidance that DAAD therapy is likely to be

more effective before the patient suffers significant liver damage, VDOC Guidelines from 2015 through the time Mr. Routon sought treatment were contrary to prevailing medical standards in that they did not provide treatment for all persons with chronic HCV infection, and only treated individuals who have suffered significant liver damage.

## III. Plaintiff's Diagnosis and Treatment

30. On June 12, 2019, LabCorp screened Mr. Routon's collected urine sample and issued a final report indicating the presence of antibodies reflecting the possibility of infection with Hepatitis C (HCV).

31. On October 5, 2019, bloodwork was ordered to determine Mr. Routon's HCV genotype and to determine the quantity of the viral load present in his body.

32. On October 13, 2019, Mr. Routon filed an informal complaint initiating the VDOC grievance procedure, stating that "I am not properly being treated for my Hep C."

33. On October 16, 2019, Mr. Routon had blood drawn and an analysis determined that he was infected with HCV 1a genotype, and that his viral load was 5.89 IU/ml.

34. On October 23, 2019, Nurse Schnur responded to Mr. Routon's informal complaint, stating "The Doctor ordered Labs for the above stated condition and

ordered a fibroscan, all of these tests will be done and reviewed to determine appropriate treatment for Hep C."

35. On October 25, 2019, Mr. Routon was notified by Dr. Fontaine that his lab results were abnormal and that he was scheduled for an appointment with the provider.

36. On October 28, 2019, Mr. Routon underwent a Fibroscan of his liver, which indicated a score of 4.0. On the same day, defendant Dr. Harris notified Mr. Routon that the Fibroscan results were "within normal limits" and that he was therefore not going to refer him for additional treatment.

37. On October 30, 2019, Mr. Routon filed a regular grievance, stating "I have Hep C and am not receiving the appropriate direct-acting antiviral drug treatment for this condition." Mr. Routon requested to be prescribed and treated with the "appropriate direct-acting antiviral drug."

38. On December 9, 2019, Mr. Routon's regular grievance was determined to be "unfounded" by the then Assistant Warden of DCC, JoAnn Halsey-Harris, who responded, in part, that "[y]our lab work and fibroscan are within normal limits, which the treatment is not required at this time per Guidelines."

39. On December 13, 2019, Mr. Routon then submitted an appeal of the Level I grievance response.

40. On January 10, 2019, Defendant Dillman found Mr. Routon's appeal "unfounded." Dillman noted that "currently the DCC physician is responsible for [plainitff's] medical care and will determine the course of HCV Treatment as clinical needs change." Dillman also noted that "this issue is governed by OP 740.1."

41. On January 16, 2020, during a medical appointment, defendant Dr. Harris documented that Mr. Routon was "doing well. Clinically stable. No ailments noted from Hep C. No nasaeau [*sic.*], vomiting, jaundice…. No new symptoms. Asymptomatic physically. Mentally fixated on wanting to be treated now." Dr. Harris further noted that Mr. Routon was "awaiting Hep C Rx. He desires treatment before he goes home."

42. However, these treatment notes do not match Mr. Routon's recollection. During that visit, Mr. Routon informed Dr. Harris that he was having significant pain in his right side, that his stools were pastel grey, he was suffering from fatigue, had vomited on occasion, and was experiencing confusion. Furthermore, previous treatment notes in Mr. Routon's medical files indicate that he had complained of similar ailments as far back as February 2018.

43. At this appointment, defendant Dr. Harris conceded that there was no medical justification for the continued delay in treating Mr. Routon with available DAAD therapy. Defendant Dr. Harris informed Mr. Routon that he would not be

treated with DAADs until his liver had undergone significant deterioration, namely a Fibroscan reading exceeding 7.0.

44. During the appointment, defendant Dr. Harris also encouraged Mr. Routon to refuse to exit DCC on his scheduled release date until he received DAAD therapy, as such an approach would signify that “he means business.”

45. Defendant Dr. Harris further told Mr. Routon that he was “too short” (meaning he would not have enough time to complete treatment by his release date) to receive DAAD therapy. No medical justification was cited to support this position, and Mr. Routon had more than seven months remaining on his sentence at the time. The VDOC guidelines in place at the time allowed offenders with at least seven months remaining on their sentence to begin treatment.

46. Defendant Dr. Harris admitted to plaintiff that his hands were tied by VDOC policies, and that if he did prescribe DAADs to Mr. Routon, that the costs of the treatment would preclude him from being treated unless his health further deteriorated. Though it is unclear what defendant Dr. Harris was referring to, there is no question that cost considerations would have been an improper factor in determining whether to treat Mr. Routon with DAADs at that juncture.

47. Instead of treating Mr. Routon with DAAD therapy, defendants merely classified him as a chronic care clinic inmate to monitor his chronic Hepatitis C infection progress.

48. On or about October 13, 2020, VDOC released Mr. Routon without ever administering treatment for Hepatitis C, in an extreme deviation from the standard of care.

49. In 2020, VDOC removed from its guidelines the treatment restrictions focused on disease severity. Any individual with a HCV diagnosis became eligible for treatment.

50. In 2023, Mr. Routon was re-incarcerated. He is currently housed at River North Correctional Center.

51. Consequently, Mr. Routon, finally eligible to receive DAADs, began such treatment in December 2023 and completed it in February 2024.

## COUNT I
## DEPRIVATION OF EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT BY RECEIVING ACCESS TO ADEQUATE MEDICAL CARE PURSUANT TO 42 U.S.C § 1983
(Federal claim against all defendants)

52. Plaintiff incorporates by reference herein the preceding paragraphs of this Amended Complaint.

53. Defendants knew that Mr. Routon had HCV, a serious medical condition, that the medically accepted treatment for HCV is the use of DAAD therapy, and that denying Mr. Routon DAAD therapy placed him at a substantial risk of serious harm. Still, they ignored multiple requests for medical treatment and unreasonably

delayed providing DAAD therapy, in deliberate indifference to Mr. Routon's serious medical needs and in violation of the Eighth Amendment.

54. Defendants Dr. Amonette, Dr. Herrick, and Walters drafted and approved HCV treatment guidelines which were contrary to prevailing medical authority. The inclusion and exclusion criteria for treatment were inconsistent with prevailing medical authority. At the time Mr. Routon sought treatment, these defendants were aware that the HCV treatment guidelines were contrary to prevailing medical authority but refused to develop guidelines in accordance with AASLD recommendations.

55. Rather than providing DAAD treatment for all patients with HCV, defendants Dr. Amonette, Dr. Herrick, and Walters chose to defer treatment of inmates with low scores for liver damage, contrary to established and prevailing medical standards.

56. Defendants Dr. Harris, Dr. Amonette, and Dillman were aware of Mr. Routon's serious medical needs but did not provide him with DAAD treatment, because he did meet VDOC guidelines as they existed at the time he sought treatment, even though they knew that the VDOC Guidelines were contrary to established and prevailing medical standards.

57. The failure of all defendants to provide timely and appropriate medical care caused Mr. Routon physical pain and suffering, mental anguish, emotional distress,

as well as an increased probability of liver inflammation, liver fibrosis, cirrhosis, and other forms of advanced liver disease, including cancer, and increased rates of morbidity and mortality.

58. Defendants' refusal to provide adequate medical care for Mr. Routon's serious medical needs in an appropriate and timely manner, specifically their unreasonable delay in providing Mr. Routon DAAD therapy, constituted deliberate indifference to his serious medical needs.

59. By failing to provide Mr. Routon with constitutionally adequate medical care, the defendants knowingly disregarded an excessive risk to his health and safety and knowingly subjected him to pain, suffering, and physical and mental injury, thereby violating his rights under the United States Constitution.

## COUNT II
## SUPERVISORY LIABILITY
## PURSUANT TO 42 U.S.C § 1983
(Federal claim against defendants Dr. Amonette, Dr. Herrick, and Walters)

60. Plaintiff incorporates by reference herein the preceding paragraphs of this Amended Complaint.

61. Defendants Dr. Amonette, Dr. Herrick and Walters are liable under the theory of supervisory liability because they ordered, condoned and ratified conduct that is the direct and proximate cause of Mr. Routon's chronic Hepatitis C going

untreated by VDOC during the entire time he was under their custody and care, up until his 2020 release—despite defendants knowing of a cure for Hepatitis C for several years while Mr. Routon was under their custody and care.

62. Defendants Dr. Herrick and Walters are liable under the theory of supervisory liability because they had actual or constructive knowledge of Mr. Routon's condition and that the medically unjustified delay in providing him DAAD treatment was attributable to the medically deficient policy that Dr. Herrick and Walter's subordinate had created, and that they themselves had approved.

## COUNT III
## MEDICAL MALPRACTICE
## (State claim against defendant Dr. Harris)

63. Plaintiff incorporates the allegations set forth above as if fully set forth herein.

64. Defendant Dr. Harris had a duty to use the degree of skill and diligence used by reasonably prudent practitioners regarding Mr. Routon's medical care, including providing prompt treatment for his HCV. Dr. Harris breached this duty, which constituted malpractice.

65. As a direct and proximate result of the malpractice of Dr. Harris, Mr. Routon has suffered physical pain and suffering, mental anguish, emotional distress, as well as an increased probability of liver inflammation, liver fibrosis,

cirrhosis, and other forms of advanced liver disease, including cancer, and increased rates of morbidity and mortality.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that the Court:

a. ENTER JUDGMENT holding the defendants liable for damages arising from defendants' constitutional and statutory violations, including for pain and suffering, in an amount to be determined at trial;

b. AWARD plaintiff his costs and reasonable attorneys' fees under 42 U.S.C § 1988(b);

c. AWARD plaintiff punitive damages appropriate to the proof at trial; and

d. GRANT such other and further relief as is just.

## DEMAND FOR JURY

Plaintiff hereby demands a trial by jury for all claims presented.

Dated: April 14, 2024

Respectfully submitted,

/s/ Daniel H. Goldman
Daniel H. Goldman, #82144
The Law Office of
Daniel Goldman, PLLC
421 King Street, Suite 505
Alexandria, Virginia 22314
(202) 677-5709
dan@dangoldmanlaw.com

Evan M. Goldberg
*Pro hac vice pending*
The Law Office of Evan M. Goldberg
5423 32nd St NW
Washington, DC 20015
Tel: (504) 717-5005
egoldberg.esq@gmail.com

**Certificate of Service**

I, Daniel H. Goldman, do hereby certify that on April 14, 2024, the foregoing document was filed with the Clerk of Court using the CM/ECF system.